571 A.2d 942

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. THEO-
DORE G. HAMMOND, DEFENDANT–RESPONDENT.

Argued November 6, 1989—Decided March 26, 1990.

*Boris Moczula,* Deputy Attorney General, argued the cause for appellant (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

*Charles J. Casale, Jr.,* argued the cause for respondent.

The opinion of the Court was delivered by

HANDLER, J.

The issue presented by this appeal is whether involuntary intoxication, as defined under the New Jersey Code of Criminal Justice, can be a defense to a drunk-driving charge under the State's Motor Vehicle Act. The Motor Vehicle Act prohibits the operation of a motor vehicle "while under the influence of intoxicating liquor, ... or ... with a blood alcohol concentration of 0.10% or more ... in the defendant's blood." *N.J.S.A.* 39:4–50. The New Jersey Code of Criminal Justice provides generally that intoxication can constitute an "affirmative defense" if it deprives the defendant of the "capacity either to appreciate [the] wrongfulness [of his or her conduct] or to conform his [or her] conduct to the requirements of the law." *N.J.S.A.* 2C:2–8. We now hold that motor vehicle violations are not offenses under the Code of Criminal Justice, and hence the Code's provisions, including the involuntary intoxication defense, do not apply to a defendant charged with operating a motor vehicle under the influence of intoxicating liquor in violation of the Motor Vehicle Act.

## I.

The defendant, Theodore Hammond, had a small dinner party at his home on May 31, 1985. While he was cooking dinner, a friend, Joe Hovanec, made him a mixed vodka drink, which he drank at about nine o'clock. At dinner, defendant and his three friends shared a bottle of wine, of which defendant testified he drank one and a half to two glasses.

After dinner, Hammond and his friends decided to visit the new home of one of the party, Henry Spence. At Spence's house, at around midnight, defendant asked for some fruit juice. Spence testified that as a practical joke he prepared a mixture of cranberry juice and vodka, concocted in such a way as to disguise any taste of alcohol. Spence stated he learned this trick from bartenders at the restaurant where he worked. Defendant stated that he did not know Spence had put vodka in

the juice. He drank two cups of this mixture at Spence's home, and another cup in the car on the way to a bar, consuming approximately ten to twelve ounces of vodka. Defendant testified that he was not "feeling well" at that point, but felt obligated to proceed to the bar since he had agreed to meet Hovanec there. Spence drove Hammond's car to the bar.

According to the defense testimony, at the bar Hovanec bought Hammond a beer which he did not drink. Since Hammond said he felt sick, and Spence had left the bar, Hovanec offered Hammond a ride home. But Hammond refused the ride. At trial, he stated he felt he "was being held together with something.... And if I could get home before I unglued, I'd be okay." Defendant also stated that "it was beginning to storm, and I just had to get home."

At 2:27 a.m. on Route 31 in Hopewell Township, Officer William Reading observed a vehicle that, he reported, was going slowly then suddenly accelerating, braking excessively, drifting between lanes, and using the right turn signal to turn left. At one point the vehicle almost hit a tree, then continued to move erratically. The officer signaled the car to pull over and stop. On exiting the car defendant stumbled, grabbing the car door for support as he fell. The police report indicates that Hammond could hardly walk, had bloodshot eyes, slurred his speech, and smelled of alcohol.

In the ensuing conversation defendant reportedly told the officer he was very sorry, that he had made a mistake, that he does not drink, and that this was a "one time shot" for him. Defendant also told the officer he had had a beer to drink, which contradicts the record, including defendant's own testimony. Breathalyzer test results were .20 at 3:20 a.m., and .21 at 3:28 a.m.

At the Municipal Court hearing, Hammond, Spence and Hovanec testified for the defense. It was stipulated that Officer Reading would have testified to the information contained in the police report. It was further stipulated that an expert

witness for the defense, Dr. Zylman, would have testified "that the defendant could ... imbibe 10, 11, or 12 ounces ... (of the cranberry-vodka mixture) over a period of an hour and a half or two hours in separate drinks, without tasting the vodka portion of the drinks so as to be aware that the drinks contain an alcoholic beverage."

The court found defendant guilty, giving credence to the police report, as well as defendant's statements to the officer that he had had beer, but discounting as incredulous the testimony that Spence wandered off, letting his friend Hammond drive himself home after having spiked his juice. The court stated further:

> [T]here is no question that involuntary intoxication is a defense, and would have applied in this case had the court concluded factually that the defendant consumed this substance without his knowledge.

Hammond was given the statutorily minimum sentence for a violation of *N.J.S.A.* 39:4–50, including a $250 fine, twelve to forty-eight hours at an Intoxicated Driver Resource Center and loss of his driving privileges for one hundred eighty days. The court stayed the sentence pending appeal.

Defendant appealed his conviction to the Law Division. The court found that the record indicated beyond a reasonable doubt that defendant had operated his vehicle while intoxicated and thus was guilty of violation of *N.J.S.A.* 39:4–50. The court found there was "no need ... to consider [the argument] ... that the defendant was, in fact, involuntarily intoxicated." The court added, however, that it did not "endorse or accept the Municipal Court's statement ... that involuntary intoxication is a defense to the drunk driving statute."

Defendant again appealed his conviction raising the involuntary intoxication defense, among other issues that are no longer contested. The Appellate Division reversed the judgment of conviction, holding that the involuntary intoxication defense can apply to a violation of *N.J.S.A.* 39:4–50, and remanding the matter to the Law Division for a retrial consistent with its determination. We granted the State's petition for certification

and denied defendant's cross-petition. 114 *N.J.* 474, 555 *A.*2d 601 (1989).

## II.

In addressing the issue whether involuntary intoxication as defined by the Code can be applied as an affirmative defense to the motor vehicle violation of driving while intoxicated, the Court must determine initially whether a violation of the Motor Vehicle Act constitutes an "offense" within the meaning of the Code of Criminal Justice. If it does, then, as the Appellate Division explained, several provisions of the Code, including the defense of involuntary intoxication, could apply in the prosecution of the DWI offense.

The Appellate Division reasoned as follows:

[I]nvoluntary intoxication [*N.J.S.A.* 2C:2–8], theoretically, can be a defense to a DWI charge [in violation of *N.J.S.A.* 39:4–50]. The statutory basis for such a defense is found in *N.J.S.A.* 2C:2–1(a). It provides that: "a person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable. A bodily movement that is not a product of the effort or determination of the actor, either conscious or habitual, is not a voluntary act within the meaning of this section." An "offense" is defined as a "crime, a disorderly persons offense or a petty disorderly persons offense ..." *N.J.S.A.* 2C:1–14(k). Disorderly persons offenses and petty disorderly offenses are characterized by the Code as "petty offenses." *N.J.S.A.* 2C:1–4(b). Motor vehicle violations in this State are considered to be "petty offenses." *Macuk,* 57 *N.J.* 1, 9 [268 *A.*2d 1] (1970); *Senno,* 79 *N.J.* 216, 223 [398 *A.*2d 873] (1979). There is no indication in *N.J.S.A.* 39:4–50(a) that the Legislature intended strict liability to apply simply by proof of operation. Thus, as a matter of elemental fairness, a voluntary act is minimally required to prove culpability. *N.J.S.A.* 2C:2–2(c)(3). [Slip op. at 10.]

Critical to the Appellate Division's logic is its assumption that a motor vehicle violation is a "petty offense," coming within the Code's definition of an "offense." *N.J.S.A.* 2C:1–14k. The Code definition of an "offense" in turn invokes *N.J.S.A.* 2C:1–5(b), which provides: "The provisions of subtitle 1 of the code are applicable to offenses defined by other statutes." These include provisions governing liability, such as *N.J.S.A.* 2C:2–1 (Requirement of voluntary act), and *N.J.S.A.* 2C:2–2 (General requirements of culpability), and, according to the Appellate

Division, *N.J.S.A.* 2C:2-8, the so-called "involuntary intoxication" defense.

The Code itself does not actually use the Appellate Division's term, "petty offense." It describes an "offense" only as "a crime, a disorderly persons offense or a petty disorderly persons offense ..." *N.J.S.A.* 2C:1-14k. In characterizing the motor vehicle violation of drunk driving as a "petty offense" the Appellate Division seized terminology used in earlier decisions: *State v. Macuk,* 57 *N.J.* 1, 268 *A.*2d 1 (1970), and *State v. Senno,* 79 *N.J.* 216, 398 *A.*2d 873 (1979).

In *Macuk,* the Court held that "Miranda warnings are not required prior to the administration of drunkometer tests," observing "that motor vehicle violations are not 'crimes' in this state, but only petty offenses." 57 *N.J.* at 16, 268 *A.*2d 1. In *Senno,* the Court held that those accused of motor vehicle violations or of petty offenses are not entitled to access to pretrial intervention programs. For these purposes, "disorderly persons offenses and motor vehicle violations are considered petty offenses ... [and so] are not, strictly speaking, criminal in nature." *Senno, supra,* 79 *N.J.* at 223, 398 *A.*2d 873. The description of motor vehicle violations in these cases was not meant as a formal classification for Code purposes, but simply to distinguish such violations from "full-blown crime[s]." *Macuk, supra,* 57 *N.J.* at 16, 268 *A.*2d 1. Hence, in characterizing motor vehicle violations as "petty offenses" only to distinguish them from more serious offenses, neither *Macuk* nor *Senno* provides authority for the position that these violations were intended to constitute "offenses" under the Code. *See also State v. Dively,* 92 *N.J.* 573, 585, 458 *A.*2d 502 (1983) (in the context of double jeopardy claims, "[m]otor vehicle violations have not been considered to be crimes, but only petty offenses," citing *State v. Tropea,* 78 *N.J.* 309, 314, 394 *A.*2d 355 (1978)).

The legislative history of the Code, unquestionably an important reference in the search for statutory meaning, *State v. Wright,* 107 *N.J.* 488, 496–497, 527 *A.*2d 379 (1983); *State v.*

*Madden,* 61 *N.J.* 377, 389, 294 *A.*2d 609 (1972), also indicates that the Code provisions were not intended to apply to motor vehicle offenses. In 1978, the Division of Criminal Justice, Department of Law and Public Safety, expressed concern that because *N.J.S.A.* 2C:1–14(a) of the newly-enacted Code of Criminal Justice "defines the term 'statute' as including ordinances, some may read 2C:1–5b to apply, although unintentionally, to ... motor vehicle violations. Accordingly, legislative clarification is needed." *"An Analysis of the Procedural and Sentencing Provisions of the New Jersey Penal Code,"* 6 *Crim. Just.Q.* 124, 128 (1978). The Senate Judiciary Committee then, in conjunction with the Legislature's consideration of the need for amendatory legislation to modify the recently enacted Code, expressed the view that the Code did not apply "to such matters as motor vehicle violations ..." *Senate Judiciary Committee Statement, No. 3203* (1979). Even though the Committee referred to the Code's "procedural" provisions, it is readily inferable that the Committee contemplated the withdrawal generally of all motor vehicle offenses from the purview of Subtitle I in light of the express concern articulated by the Division of Criminal Justice. Hence, the definition of *N.J.S.A.* 2C:1–14k of "offenses" under the Code to include "disorderly persons offenses" and "petty disorderly persons offenses," but not specifically motor vehicle violations, is consistent with this understanding. The Committee's contemporaneous expression of legislative understanding is entitled to considerable weight in ascertaining the intent of the Legislature when the Code was enacted and amended. *See State v. Madden, supra,* 61 *N.J.* at 389, 294 *A.*2d 609; *N.J. Pharmaceutical Ass'n v. Furman,* 33 *N.J.* 121, 130, 162 *A.*2d 839 (1960).

The legislative history of the Motor Vehicle Act further confirms that the Legislature did not intend to cover motor vehicle offenses under the Code. Originally, drunk driving was treated under the Disorderly Persons Act as an ordinary disorderly persons offense. *L.*1913, *c.* 67, § 1. The Legislature, however, in 1921, transferred the offense of "operat[ing] an

automobile ... while under the influence of intoxicating liquor" from the Disorderly Persons Act to Title 39, the Motor Vehicle Act. *L.*1921, *c.* 208, § 14. That statutory change effectuated the recommendation of a Commission constituted to study the question. *Motor Vehicle and Traffic Act,* Report to Governor and Legislature, 1 (1921). The Report urged that the Motor Vehicle Act be changed to transfer "the prohibition against intoxicated driving from the Disorderly Persons Act to the Motor Vehicle Act ..." *Id.* at 14. Moreover, no subsequent statutory treatment of drunk driving violations in any way suggests a change in the legislative decision to separate motor vehicle violations from disorderly persons offenses under the state's general criminal laws. *See, e.g., State v. Tischio,* 107 *N.J.* 504, 527 *A.*2d 388 (1987) (recapitulating history of amendments to driving-while-intoxicated provisions of Motor Vehicles Act). It is thus readily inferable from all the relevant legislative history that the Legislature did not intend to include motor vehicle violations under the Code. *See, e.g., State v. West,* 416 *A.*2d 5, 7–8 (Me.1980) (the history of Maine's Criminal Code and the history of its drunk driving statute indicate "that the provisions of ... the criminal code do not apply to the conduct prohibited by [the driving under the influence statute].").

Of equal importance to this analysis is that the application of the involuntary intoxication defense to drunk driving does not make good sense. The Code defense of involuntary intoxication states that "[e]xcept as provided in subjection d of this section, intoxication ... is not a defense unless it negatives an element of the offense." *N.J.S.A.* 2C:2–8. The Appellate Division concluded that "voluntary" intoxication should be imputed as an element of drunk driving because that would be consistent with general Code provisions relating to culpability, *N.J.S.A.* 2C:2–2, and voluntary conduct, *N.J.S.A.* 2C:2–1, even if not expressly or clearly mandated by the Code. There is, however, a fatal circularity in that reasoning. It is only by assuming that *N.J.S.A.* 39:4–50 itself requires a voluntary act relating to the consumption of an intoxicating liquor that "voluntary intox-

ication" would constitute "an element of the offense." However, *N.J.S.A.* 39:4–50 does not specify that the voluntary or knowing consumption of alcohol itself is an element of the offense of drunk driving. Nor is there any provision in the Code that independently directs the application of voluntariness and culpability standards to the motor vehicle violation of drunk driving or implies that voluntary or knowing consumption, as such, is a necessary precondition to intoxication, which itself is an essential element of the violation. Hence, as the court concluded in *State v. West, supra*, involuntary intoxication is not a defense to the motor vehicle violation of drunk driving.

> [I]ntoxication is not a defense unless it establishes a reasonable doubt as to the existence of an element of the offense ... [Since driving under the influence] ... is not subject to the provisions of ... the criminal code requiring a 'culpable mental state' ... [and] the only elements of the offense charged are operating a motor vehicle and being under the influence of intoxicating liquor while doing so, it follows that intoxication ... cannot establish a reasonable doubt as to the existence of any element of the ... offense. [416 *A*.2d at 8.]

*See also Minneapolis v. Altimus*, 306 *Minn.* 462, 238 *N.W.*2d 851, 854–55 (1976) (intoxication is a defense to a charge other than drunkenness "only if a specific intent or purpose is an essential element of the crime charged.... Because ... traffic offenses with which defendant was charged do not require a specific intent ... the defense ... cannot and does not apply.")

> The Code further specifies that involuntary intoxication is an affirmative defense if by reason of such intoxication the actor at the time of his conduct lacks ... capacity either to appreciate its wrongfulness or to conform his conduct to the requirement of law. [*N.J.S.A.* 2C:2–8.]

The Appellate Division believed these provisions could be applied to drunk driving and, as noted, would be consistent with general Code requirements of culpability and voluntariness; indeed, it felt that if the involuntary intoxication defense did not apply to drunk driving, that motor vehicle offense would be based solely on "strict liability," a construction that should be avoided under the Code. *See N.J.S.A.* 2C:2–2. However, driving under the influence has generally been considered an absolute liability offense requiring no culpable mental state, including knowledge of one's intoxication. *See, e.g., People v. Tes-*

*chner,* 76 *Ill.App.*3d 124, 31 *Ill.Dec.* 691, 692, 394 *N.E.*2d 893, 894 (1979) ("for motor vehicles offenses a defendant's intent, knowledge or motive is immaterial to the question of guilt."). As observed by the court in *Wichita v. Hull,* 11 *Kan.App.*2d 441, 447, 724 *P.*2d 699, 702 (1986), most jurisdictions addressing this issue have concluded that driving while under the influence is an absolute liability offense, citing *State v. Williams,* 144 *Ariz.* 487, 698 *P.*2d 732 (1985); *Bodah v. D.C. Bur. of Motor,* 377 *A.*2d 1135 (1977); *State v. Goding,* 126 *N.H.* 50, 489 *A.*2d 579 (1985); *State v. Pistole,* 16 *Ohio App.*3d 386, 476 *N.E.*2d 365 (1984).

Moreover, it is settled that under our motor vehicle provisions for drunk driving, it is the objective state of intoxication that is crucial, *State v. Downie,* 117 *N.J.* 450, 569 *A.*2d 242 (1990), provided intoxication is correlated with the operation of the motor vehicle, *State v. Tischio, supra,* 107 *N.J.* 504, 527 *A.*2d 388. The antecedent circumstances resulting in intoxication are relevant only in terms of their probative bearing on whether the driver was intoxicated while operating the motor vehicle. *Cf. State v. Mulcahy,* 107 *N.J.* 467, 527 *A.*2d 368 (1987) (in DWI case, circumstances of defendant's prior behavior evidencing intoxication relevant when defendant is arrested attempting to drive automobile). The Legislature has thus made it clear that once drivers become intoxicated and operate a motor vehicle, it does not matter how they became intoxicated or whether they realized they were intoxicated or believed they could overcome the effects of intoxication. *See People v. Kappas,* 120 *Ill. App.*3d 123, 76 *Ill.Dec.* 1, 6, 458 *N.E.*2d 140, 145 (1983) (defendant's awareness of his intoxication "simply does not matter since the liability is absolute.... The violation is in the doing, not the knowing."). It is apparent that if the affirmative defense of involuntary intoxication under *N.J.S.A.* 2C:2-8 were applied to *N.J.S.A.* 39:4-50, it would negate or derogate from the standard of objective intoxication. It would allow proof that simply because intoxication is "involuntary," a motorist unable to refrain from driving or to appreciate that it was

wrong to drive while so intoxicated could be excused. Yet, it is precisely those conditions—the inability to stop driving or to evaluate the wrongfulness of driving while drunk—that the statute seeks to punish. The interjection of "involuntariness" or lack of knowledge as an excuse would be wholly discordant with the liability envisioned by the statute. The application of the involuntary intoxication defense would be anomalous: the more drunk the driver is, the less culpable he or she would be. *See State v. Grotzky*, 222 *Neb.* 39, 382 *N.W.*2d 20 (1986) ("excessive intoxication" is not available as a defense to drunk driving because criminal intent is not necessary to prove the charge).

It is well to recapitulate the evolution of the drunk driving statute on this point. The aim of the statute has moved from the driver's subjective state of intoxication or personal tolerance to alcohol, including the individual circumstances surrounding the manner in which the driver became intoxicated, to an objective one. *See Romano v. Kimmelman*, 96 *N.J.* 66, 78, 474 *A.*2d 1 (1984). The earliest standard defining drunk driving as a disorderly persons offense, *L.*1913, *c.* 67, § 1, which was transferred to Title 39, *N.J.S.A.* 39:4–50(a); *L.*1921, *c.* 208, § 14, permitted evidence of subjective intoxication. *See, e.g., State v. Lutz*, 149 *N.J.Super.* 470, 374 *A.*2d 54 (1977) (defendant presented expert witness testimony in attempt to prove he was not "under the influence" despite consuming four or five shots of whiskey and a breathalyzer reading of .18); *State v. Ryan*, 133 *N.J.Super.* 1, 334 *A.*2d 402 (Law Div.1975) (indigent defendant may be entitled to expert witness at public expense for defense of DWI charge, if defendant can show expert is necessary for defense to show he was not intoxicated). Because of the difficulty of determining when a person was actually "under the influence," the Legislature, in 1951, enacted *N.J.S.A.* 39:4–50.1, establishing a presumption that with a .15% blood alcohol level, a defendant is intoxicated. *L.*1951, *c.* 23, § 30. That presumption was rebuttable, serving to reduce but not eliminate the relevance of subjective intoxication. *See, e.g.,*

*State v. Lutz, supra,* 149 *N.J.Super.* 470, 374 *A.*2d 54; *State v. Ryan, supra,* 133 *N.J.Super.* 1, 334 *A.*2d 402. In 1977, amendments were enacted that lowered the presumption of intoxication to .10% blood alcohol level. *L.*1977, *c.* 29, § 1. And, in 1983 the Legislature made driving with a .10% blood alcohol level a *per se* offense. *Romano v. Kimmelman, supra,* 96 *N.J.* 66, 474 *A.*2d 1. The purpose and effect of these amendments were to eventually eliminate evidence of subjective intoxication, *State v. Downie, supra,* 117 *N.J.* 450, 569 *A.*2d 242. The Legislature has thus made crystal clear that intoxication objectively determined by a breathalyzer test coupled with the operation of a motor vehicle constitutes the offense of drunk driving. *Ibid.; State v. Tischio, supra,* 107 *N.J.* 504, 527 *A.*2d 388.

We have further observed with respect to the foregoing statutory development that "[t]he primary purpose of *N.J.S.A.* 39:4–50.1 [creating a *per se* offense] was to eliminate the necessity for expert and other testimony relating to the existence and degree of intoxication." *State v. Tischio, supra,* 107 *N.J.* at 515, 527 *A.*2d 388; *State v. Downie, supra,* 117 *N.J.* 450, 569 *A.*2d 242. It would be anomalous to construe the statute to disallow "testimony relating to the existence and degree of intoxication," while allowing expert testimony concerning how the defendant became intoxicated. To permit defendants to produce evidence that they did not know they were drunk or how they became drunk would defeat the Legislature's purpose in declaring a .10% blood alcohol level a *per se* offense.

Our holdings in *Downie* and *Tischio* confirm a clear legislative intent and a strong legislative policy to discourage long trials complicated by pretextual defenses. Yet that is what defendant seeks to accomplish in this case. Defendant does not contend that what he ingested did not create objectively all of the well-known symptoms of intoxication or did not result in a breathalyzer reading that *per se* constitutes intoxication. Defendant's expert testimony was proffered only to confirm his

contention that he drank liquor unwittingly. Indeed, defendant does not even argue that he had nothing intoxicating to drink the night he was arrested, but only that *some* of his consumption of alcohol was unknowing and "involuntary." This kind of defense has every potential for being pretextual, and is the kind of tendentious defense the Legislature sought to discourage by its enactment of a statute based on objective measurements of intoxication.

An interpretation of the statute that would recognize "involuntary intoxication" as an affirmative defense to drunk driving would also disserve broader policy goals. In *State v. Tischio, supra,* we found "[t]he primary purpose behind New Jersey's drunk-driving statutes is to curb the senseless havoc and destruction caused by intoxicated drivers ... [and] to eliminate intoxicated drivers from the roadways of this state." 107 *N.J.* at 512–14, 527 *A.*2d 388. "To allow such a defense [as involuntary intoxication] to a charge of driving while intoxicated," as the court observed in *People v. Teschner, supra,* 76 *Ill.App.*3d 124, 31 *Ill.Dec.* at 693, 394 *N.E.*2d at 895, "would result in the inadequate protection of the public from the dangers of intoxicated drivers." An interpretation of *N.J.S.A.* 39:4–50 that would allow exculpatory evidence regarding the driver's subjective mental state relating to the manner, existence, and degree of intoxication, including testimony of the expert witnesses that such intoxication was "involuntary," would surely frustrate the efficient and vigorous enforcement of our laws against driving while intoxicated.

## III.

We hold that the provisions of the Code governing principles of liability are not applicable to the motor vehicle violation of driving while intoxicated under *N.J.S.A.* 39:4–50. The Code defense of involuntary intoxication, *N.J.S.A.* 2C:2–8, is not a defense to this violation.

The judgment of the Appellate Division is reversed and the sentence imposed by the Law Division is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—6.

*Opposed*—None.